

FILED & ENTERED

NOV 25 2015

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | |
|---|---|
| In re:    HARRY ROUSSOS and THEODOSIOS ROUSSOS, Debtors | Case Nos.:  2:15-bk-21624-ER and 2:15-bk-21626-ER (jointly administered) |
| | Adv. Nos.:  2:15-ap-01404-ER and 2:15-ap-01406-ER |
| HOWARD M EHRENBERG, Chapter 7 Trustee,<br><br>                                            Plaintiff<br><br>v.<br><br>HARRY ROUSSOS, an individual; THEODOSIOS ROUSSOS, an individual; CHRISTINE ROUSSOS, an individual; PAULA ROUSSOS, an individual; O.F. ENTERPRISES, L.P., a California limited partnership; LIRO, INC., a California corporation; S.M.B. INVESTORS ASSOCIATES, L.P., a California limited partnership; S.M.B. MANAGEMENT, INC., a California corporation; Chase Bank, N.A.; and OneWest Bank, N.A.<br><br>                                            Defendants | **AMENDED MEMORANDUM OF DECISION DENYING MOTIONS TO DISMISS**<br><br>Date:     November 12, 2015<br>Time:     10:00 a.m.<br>Location: Ctrm. 1568<br>          Roybal Federal Building<br>          255 East Temple Street<br>          Los Angeles, CA 90012 |

    At issue is whether a 21-year old bankruptcy sale may be set aside for fraud on the court under Fed. R. Civ. P. 60(d)(3), even in the absence of specific allegations that the fraud reduced

the sales price. The fraud alleged here was so serious as to prevent the judicial machinery from performing "in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Anand v. CITIC Corp. (In re Intermagnetics Am., Inc.)*, 926 F.2d 912, 916 (9th Cir. 1991). The Chapter 7 Trustee's Complaint to vacate the sale for fraud on the court states a claim upon which relief can be granted, and the motions to dismiss are denied.[1]

# I. Facts[2]

In the early 1980s, August Michaelides partnered with Theodosios Roussos ("Theodosios") and Harry Roussos ("Harry")[3] (collectively, the "Roussos Brothers") to purchase two apartment buildings in the greater Los Angeles area: (1) a 20-unit building located at 2727–2741 Abbott Kinney Boulevard, Venice, CA ("Abbot Kinney Property") and (2) a 30-unit building located at 153 San Vicente Boulevard, Santa Monica, CA ("San Vicente Property") (collectively, the "Properties"). Complaint [Doc. No. 1] at ¶26.[4] Pursuant to the agreement with the Roussos Brothers, August was to receive a 33 1/3% ownership interest in the Abbot Kinney Property and a 10% ownership interest in the San Vicente Property. *Id.* at ¶27.

August Michaelides died in 1992. *Id.* at ¶28. When his widow Lula Michaelides ("Michaelides") inquired about her pro-rata share of income from the Properties, she failed to receive satisfactory responses from the Roussos Brothers. *Id.* at ¶29. Michaelides then discovered that the Roussos Brothers had failed to include her husband August on title to the Properties. *Id.*

Michaelides commenced an action to quiet title in the Los Angeles Superior Court ("State Court").[5] *Id.* at ¶30. On March 2, 1994, the State Court entered judgment awarding Michaelides monetary damages and quieting title to the Properties. *Id.* at ¶31. On June 15, 1994, the State Court entered an amended judgment ("Amended State Court Judgment") awarding $600,000 in compensatory damages, $400,000 in punitive damages, and $10,000 in costs, and quieting Michaelides' title to the 10% interest in the San Vicente Property and the 33 1/3% interest in the Abbot Kinney Property. *Id.* at ¶¶31–32.

The Roussos Brothers retained attorney Robert Beaudry ("Beaudry") to facilitate a conspiracy in which the Properties would fraudulently be transferred out of their names and into the names of corporate entities which they secretly controlled, thereby extinguishing Michaelides' fractional interest. *Id.* at ¶33. In furtherance of the conspiracy, Beaudry formed S.M.B. and O.F., both of which were controlled by Harry and Theodosios and their spouses Paula and Christine. *Id.* at ¶¶34–36. The Roussos Brothers then filed individual chapter 11 petitions[6] and filed a motion to sell the Properties to S.M.B. and O.F. free and clear of

---

[1] This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and General Order No. 13-05 of the U.S. District Court for the Central District of California.

[2] In the context of a motion to dismiss, all facially plausible allegations in the Complaint are accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[3] Given names are used to distinguish multiple parties with the same surname. No disrespect is intended.

[4] The Trustee filed two identical complaints—one in Harry's case (Adv. No. 2:15-ap-01406-ER) and the other in Theodosios' case (Adv. No. 2:15-ap-01404-ER). Unless otherwise indicated, all citations to the docket refer to Adv. No. 2:14-ap-01406-ER. As the complaints are identical, to avoid confusion the Court refers to the complaint in the singular.

[5] The action, *Lula Michaelides, et al. v. Theodosios Roussos, et al.*, was assigned Case No. BC054809.

[6] Theodosios and Harry's voluntary chapter 11 petitions were filed on June 14, 1993. The cases were jointly administered. Case No. 1:93-bk-31261-AG pertains to Harry; Case No. 1:93-bk-31265-AG pertains to Theodosios. When the cases were reopened in 2015, new case numbers were assigned: Case No. 2:15-bk-21624-ER pertains to Harry; Case No. 2:15-bk-21626-ER pertains to Theodosios.

Michaelides' interest ("Sale Motion"). *Id.* at ¶¶37–39. On August 5, 1994, the Bankruptcy Court approved the sale, free and clear of Michaelides' interest ("Sale Order"). *Id.* at ¶40 and Exhibit 4. The Sale Order gave S.M.B. and O.F. protection as good-faith purchasers pursuant to §363(m). *Id.*

In approving the sale, the Bankruptcy Court relied upon declarations submitted by Theodosios and Harry, which falsely stated that the sale was an arms-length transaction; that neither Theodosios or Harry held any interest in S.M.B. and O.F.; and that the Properties were over-encumbered. *Id.* at ¶41. The Bankruptcy Court would not have approved the sale had it known that Theodosios and Harry controlled S.M.B. and O.F.; that the Properties were not over-encumbered; and that the sale motion was part of the Roussos Brothers' conspiracy to dispossess Michaelides of her fractional interest. *Id.* at ¶42.

On October 19, 1994, the Roussos Brothers executed a grant deed conveying title to the Abbott Kinney Property to O.F. *Id.* at ¶45. On November 29, 1994, the Roussos Brothers executed a grand deed conveying title to the San Vicente Property to S.M.B. *Id.* at ¶46.

The Roussos Brothers' chapter 11 cases were converted to chapter 7 on May 2, 1995.[7] Both Harry and Theodosios received discharges on January 2, 1996.[8] Michaelides' Amended State Court Judgment was excepted from discharge. *Id.* at ¶47. The cases were closed on June 27, 2002.[9]

On November 14, 2005, Michaelides conducted Theodosios' judgment debtor examination, during which Theodosios falsely testified that he and his brother Harry were not limited partners of S.M.B.; that he did not know who the limited partners of S.M.B. were; that he had not spoken to any of S.M.B.'s general partners; and that he and Harry had no interest in either S.M.B. or O.F. *Id.* at ¶49.

On November 14, 2005, Michaelides filed an alter ego action ("Alter Ego Complaint") in the Los Angeles Superior Court alleging that O.F. and S.M.B. were alter egos of the Roussos Brothers. The Alter Ego Complaint was dismissed. *Id.* at ¶50.

On July 20, 2006, Beaudry resigned from the California State Bar with charges pending relating to Beaudry's formation of sham corporations on behalf of his clients. *Id.* at ¶51.

In September and December 2014, Michaelides conducted Harry's judgment debtor examination. Harry testified that he had no interest in the Properties or in O.F. and S.M.B. *Id.* at ¶53.

In the beginning of 2015, Michaelides discovered that an arbitration action, Case No. BS138099 ("Arbitration Action"), existed between Harry and Theodosios regarding management of the Properties. *Id.* at ¶56. On June 19, 2012, Harry and his spouse Christine commenced the Arbitration Action against Theodosios and his spouse Paula. *Id.* In connection with the

---

[7] *See* Doc. No. 34, Case No. 2:15-bk-21624-ER (order denying confirmation of Harry and Theodosios' joint consolidated second amended plan of reorganization and converting the cases to chapter 7); Doc. No. 12, Case No. 2:15-bk-21626-ER (same order in Theodosios' jointly-administered case). The Court may take judicial notice of documents filed in Harry and Theodosios' bankruptcy cases pursuant to Fed. E. Evid. 201 without converting the motion to dismiss to a motion for summary judgment. *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994) (matters of public record may be judicially noticed); *Rose v. Beverly Health & Rehab. Servs., Inc.*, 356 B.R. 18, 24 (E.D. Cal. 2006), *aff'd sub nom. Rose v. Beverly Health & Rehab. Servs., Inc.*, 295 F. App'x 142 (9th Cir. 2008) (taking judicial notice of bankruptcy court filings in the context of a motion to dismiss).

[8] *See* Doc. No. 101, Case No. 2:15-bk-21624-ER (discharge of Harry); Doc. No. 48, Case No. 2:15-bk-21626-ER (discharge of Theodosios).

[9] *See* Doc. No. 362, Case No. 2:15-bk-21624-ER (order closing Harry's case); Doc. No. 80, Case No. 2:15-bk-21626-ER (order closing Theodosios' case).

Arbitration Action, David Haberbush, counsel for the Roussos Brothers, submitted a declaration stating that he had acted as legal counsel with respect to the Roussos Brothers' business operations pertaining to the Properties. *See* Declaration of David Haberbush at ¶1 (attached to the Complaint as Exhibit 8).

On June 18, 2015, Michaelides informed the United States Trustee ("UST") of the Arbitration Action. *See generally* Ex-Parte Motion to Reopen Chapter 7 Case under 11 U.S.C. §350(b) [Doc. No. 367, Case No. 2:15-bk-21624-ER]. On July 21, 2015, the UST moved to reopen Harry and Theodosios' chapter 7 cases and to appoint a Chapter 7 Trustee. The Court granted the motion on July 23, 2015. The Chapter 7 Trustee ("Plaintiff") filed the instant Complaints on August 4, 2015.

Based upon the foregoing allegations, Plaintiff seeks to vacate the Sale Order for fraud on the court pursuant to Fed. R. Civ. P. 60(d)(3), and to vacate the grant deeds transferring ownership of the Properties to O.F. and S.M.B. Complaint at ¶¶61–68 (second claim for relief). Plaintiff seeks a declaratory judgment, pursuant to 28 U.S.C. §2201, that the Properties are property of the Roussos Brothers' estates. *Id.* at ¶¶58–60 (first claim for relief). Plaintiff seeks to quiet title to the Properties as of August 5, 1994 (the date the Sale Order was entered) pursuant to California Code of Civil Procedure §761.010. *Id.* at ¶¶67–73 (third claim for relief). Plaintiff seeks turnover of the Properties pursuant to Bankruptcy Code §542.[10] *Id.* at ¶¶74–79 (fourth claim for relief). Finally, Plaintiff seeks compensatory and punitive damages for fraud and breach of fiduciary duty against Harry and Theodosios, and seeks compensatory and punitive damages against Paula Roussos, Christine Roussos, O.F., S.M.B., and S.M.B. Management for aiding and abetting breach of fiduciary duty. *Id.* at ¶¶80–97 (fifth, sixth, and seventh claims for relief).

**Motions to Dismiss**

Theodosios and Paula and O.F. Enterprises, L.P.; Liro, Inc.; S.M.B. Investors Associates, L.P.; and S.M.B. Management, Inc. (collectively, "Defendants") move to dismiss the Complaint.[11] Defendants' primary arguments are as follows:

- A sale approved by a Bankruptcy Court can be set aside only under Rule 60(b) and not under Rule 60(d)(3). The one-year statute of limitations under Rule 60(b) has expired. Theodosios Reply at 3–5.
- Even if the sale could be set aside under Rule 60(d)(3), the Complaint fails to allege facts sufficient to support a finding of fraud on the court. At most, the Complaint alleges that fraud occurred against creditors. Fraud against creditors does not amount to fraud on the court per the holdings of *Menchise v. Steffen (In re Steffen)*, 464 B.R. 450 (Bankr. M.D. Fla. 2012) and *Gekas v. Pipin (In re Met-L-Wood Corp.)*, 861 F.2d 1012 (7th Cir. 1988). Theodosios Reply at 5–9. Further, the Rule 60(d)(3) claim was not brought within a reasonable time. Theodosios MTD at 11–13.

---

[10] Unless otherwise indicated, all statutory citations refer to the Bankruptcy Code, 11 U.S.C. §§101–1532.
[11] *See generally* Notice of Motion and Motion to Dismiss Adversary Cases Pursuant to Federal Rule of Civil Procedure 12(b)(6) (filed by Theodosios and Paula Roussos) ("Theodosios MTD") [Doc. No. 22], Notice of Motion and Motion for an Order Dismissing Plaintiff's Claims for Relief Pursuant to Rule 12(b)(6) (filed by O.F. Enterprises, L.P.; Liro, Inc.; S.M.B. Investors Associates, L.P.; and S.M.B. Management, Inc.) [Doc. No. 38], Reply of Defendants Theodosios Roussos and Paul Roussos to Plaintiff's Opposition to Motion to Dismiss ("Theodosios Reply") [Doc. No. 58], and Reply to Trustee's Omnibus Opposition to Motion for an Order Dismissing Plaintiff's Claims for Relief Pursuant to Rule 12(b)(6) (filed by O.F. Enterprises, L.P.; Liro, Inc.; S.M.B. Investors Associates, L.P.; and S.M.B. Management, Inc.) [Doc. No. 59].

- The Complaint fails to allege that the sales price of the Properties was reduced by the Roussos Brothers' conspiracy. Absent an allegation of damages, the Sale Order cannot be set aside. Theodosios MTD at 16–17; Theodosios Reply at 15–18.
- Plaintiff has not pleaded sufficient new evidence to attack the Sale Order. Plaintiff's request to vacate the Sale Order contradicts public policy in support of the finality of bankruptcy sales. Collateral attacks against sale orders require an exceptional showing which Plaintiff has not met. Theodosios MTD at 20–21.
- The claims for declaratory relief, fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and quiet title are barred by the statute of limitations and cannot be tolled by the discovery rule. Theodosios MTD at 9–11; Theodosios Reply at 10–12 and 19–20.
- Plaintiff lacks standing to pursue the claim for fraud. Theodosios Reply at 12–13.
- To the extent the Complaint seeks damages based on actions taken by Harry and Theodosios prior to the conversion of their cases to chapter 7, the Complaint violates the discharge injunction entered in Harry and Theodosios' chapter 7 cases. Theodosios MTD at 15; Theodosios Reply at 18–19.
- The claim for turnover under §542 fails as a matter of law. The properties as to which Plaintiff seeks turnover are no longer property of the estate in light of the Sale Order. Theodosios MTD at 14–15; Theodosios Reply at 21–22.
- Plaintiff is judicially estopped from bringing the Complaint because Michaelides raised the same objections to the Sale Motion twenty-one years ago. Plaintiff waived any objections to the sale based on Michaelides' failure to convince the 1994 Bankruptcy Court to sustain her objections to the sale. Theodosios MTD at 19–20.

## II. Findings and Conclusions

### A. The Complaint States a Claim Upon Which Relief May Be Granted for Fraud on the Court under Fed. R. Civ. P. 60(d)(3)

Fed. R. Civ. P. 60(b) sets forth grounds upon which the Court may relieve a party from a final judgment or order. Rule 60(d)(3) explains that "[t]his rule does not limit a court's power to set aside a judgment for fraud on the court."

Rule 60(d)(3) is a codification of the Court's "inherent power … to investigate whether a judgment was obtained by fraud." *Universal Oil Products Co. v. Root Ref. Co.*, 328 U.S. 575, 580 (1946). "There is no statute of limitations for fraud on the court. And jurisdiction exists to consider such a claim even if there are no adversary parties then present before the court." *Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 640 n.10 (N.D. Cal. 1978) *aff'd,* 645 F.2d 699 (9th Cir. 1981).

Fraud on the court embraces "only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Anand v. CITIC Corp. (In re Intermagnetics Am., Inc.)*, 926 F.2d 912, 916 (9th Cir. 1991). The inquiry must focus upon "whether the alleged fraud harms the integrity of the judicial process":

> '[T]ampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot

> complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.'

*Intermagnetics*, 926 F.2d at 916–917 (citing *Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 246 (1944), *overruled on other grounds*, *Standard Oil of Cal. v. United States*, 429 U.S. 17, 18 (1976)).

As explained by the Ninth Circuit in *United States v. Estate of Stonehill*, 660 F.3d 415, 444–45 (9th Cir. 2011):

> Most fraud on the court cases involve a scheme by one party to hide a key fact from the court and the opposing party. For example, in *Levander* a corporate officer testified in a deposition that the corporation had not sold its assets, and a bankruptcy court subsequently entered a judgment against only the corporation. *Levander,* 180 F.3d at 1116–17. It turned out that the corporation had in fact transferred all of its assets to a related partnership. *Id.* We held that the false testimony constituted fraud on the court, and the bankruptcy court was allowed to amend its order to include the partnership as an additional party to the judgment. *Id.* at 1122–23.

Perjury or nondisclosure of evidence may constitute fraud upon the court if "that perjury or nondisclosure was so fundamental that it undermined the workings of the adversary process itself." *Id.* at 445.

The Complaint alleges facts sufficient to state a claim for fraud on the court. The Complaint alleges that the Roussos Brothers, as Chapter 11 debtors-in-possession, obtained court approval of the sale of the Properties to corporate entities they secretly controlled. To obtain approval of the sale, the Roussos Brothers submitted declarations falsely stating that the sale was at arms-length and that they had no interest in the purchaser entities.

The Roussos Brothers' false declarations made it impossible for the Bankruptcy Court to "perform in the usual manner its impartial task of adjudging" the sale motion. *Intermagnetics*, 926 F.2d at 912. The court's impartial review was fatally compromised by its lack of awareness of a crucial fact—that the purported arms-length sale was in reality a sale to entities controlled by insiders.

Nothing in the Bankruptcy Code prohibits a sale to insiders. However, insider sales are subject to "heightened scrutiny to the fairness of the value provided by the sale and the good faith of the parties in executing the transaction." *In re Family Christian, LLC*, 533 B.R. 600, 622 (Bankr. W.D. Mich. 2015). This is because insiders "usually have greater opportunities for … inequitable conduct." *Fabricators, Inc. v. Technical Fabricators, Inc. (Matter of Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991). *See also In re Tidal Const. Co., Inc.*, 446 B.R. 620, 624 (Bankr. S.D. Ga. 2009) ("[E]ven when parties are completely forthright with the facts surrounding the transfer, § 363 sales to insiders are subject to a higher scrutiny because of the opportunity for abuse."); *Rickel & Associates v. Smith (In re Rickel & Associates, Inc.)*, 272 B.R. 74, 100 (Bankr. S.D.N.Y. 2002) (same); *In re W.A. Mallory Co., Inc.*, 214 B.R. 834, 837 (Bankr. E.D. Va. 1997) (same).

A sale to insiders is fundamentally different from a sale at arms-length. In an arms-length transaction, the asset's exposure to the marketplace insures that the price is reasonable. Insider sales, by their very nature, lack this characteristic. Insiders do not have an incentive to

aggressively market the assets to obtain the highest price. Their incentive is just the opposite—the less marketing, and the lower the price, the better.

"The court's obligation in § 363(b) sales is to assure that optimal value is realized by the estate under the circumstances." *Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 288–89 (B.A.P. 9th Cir. 2005). As a result of the Roussos Brothers' false declarations, the court could not apply the heightened scrutiny necessary to insure that the insider sale yielded optimal value. By preventing the court from applying the correct legal standard, the Roussos Brothers' "perjury … was so fundamental that it undermined the workings of the adversary process itself." *Stonehill*, 660 F.3d at 445.

Similar to the situation in *Levandar v. Prober (In re Levander)*, 180 F.3d 1114 (9th Cir. 1999), the perjury was part of a scheme by the Roussos Brothers to "hide a key fact from the court and the opposing party." *Stonehill*, 660 F.3d at 445 (describing *Levander*). In *Levander*, the key hidden fact was that a corporation had transferred its assets to a related partnership that neither the Court nor the parties knew existed. *Levander*, 180 F.3d at 1120. As a result of the corporation's perjured statement that the assets had not been transferred, the *Levander* court imposed attorney's fees upon the wrong party. *Id.* The perjury was serious enough to constitute fraud upon the court because there was no way that the court or the parties could be aware of the deception: "[T]he perjury and non-disclosure in the instant case (that the Corporation had transferred its assets to shell entities months before the Corporation testified in depositions that the Corporation's 'assets haven't been sold') was not—and could not have been—an issue at the attorneys' fees hearing, as neither the court nor the Levanders knew that the Partnership existed." *Id.*

The false statements here are at least as serious as those in *Levander*. As was the case in *Levander*, the Bankruptcy Court did not know, and could not have known, that the entities purportedly purchasing the Properties at arms-length were in fact secretly controlled by the debtors-in-possession, the Roussos Brothers. As a result of this hidden fact, the adversary process could not function in its normal fashion. No objections were asserted to the sale based on the insider status of the purchaser entities. In a normally functioning adversary process, proposed sales to insiders frequently generate considerable creditor opposition. For example, in *Family Christian*, the debtors voluntarily withdrew a motion to sell substantially all of their assets to an insider after encountering numerous objections from creditors. 533 B.R. at 607. Even after the debtors obtained court approval of more robust bidding procedures, substantial creditor opposition to the insider bid persisted. *Id.* at 604. *See also Tidal Construction*, 446 B.R. at 622 (describing creditor objections to an insider sale); *W.A. Mallory Co.*, 214 B.R. at 835–36 (same).

The Complaint's omission of allegations that the 1994 sales price was materially lower as a result of the fraud does not defeat the fraud on the court claim. In this respect, the Court declines to follow *Menchise v. Steffen (In re Steffen)*, 464 B.R. 450 (Bankr. M.D. Fla. 2012) and *Gekas v. Pipin (In re Met-L-Wood Corp.)*, 861 F.2d 1012 (7th Cir. 1988). Both cases held that it would be fraud against creditors, but not fraud on the court, for a debtor's controlling officer "to use his control to walk off with its [the debtor's] principal assets for a song, shucking off the unsecured creditors in the process." *Met-L-Wood*, 861 F.2d at 1019. As rationale for their holdings, *Steffen* and *Met-L-Wood* point to the necessity of finality in bankruptcy sales to maximize the sales price. *Met-L-Wood*, 861 F.2d at 1019; *Steffen*, 464 B.R. at 459–60.

*Steffen* and *Met-L-Wood* pay insufficient attention to the decreased sale price that inevitably results when debtors collusively sell assets to entities under their secret control. As discussed, debtors in such schemes have no incentive to aggressively market the assets so that the estate

7

obtains optimal value. Therefore, immunizing fraudulent and collusive sales from later attack decreases sale prices. And allowing the court to remain infected by such serious fraud undermines the legitimacy of the bankruptcy sales process, further deterring serious bidders.

Indeed, the Sale Motion suggests that the Properties may not have been adequately marketed.[12] Theodosios' declaration in support of the Sale Motion states that he did not enter into a listing agreement with any real estate brokers, purportedly because each broker demanded exclusivity and Theodosios "wanted the widest possible base of support in marketing" the Properties. Declaration of Theodosios Roussos at ¶14 (Complaint, Exhibit 4). The marketing efforts consisted of informal contact with real estate brokers and the distribution of flyers. *Id.* The Sale Motion does not specify how many flyers were distributed or where they were distributed. Once again, the Bankruptcy Court's lack of awareness of the true nature of the sale prevented it from applying the heightened scrutiny that could have brought to light any inadequacies in the marketing process.

Relying upon *Robertson v. Isomedix, Inc. (In re Int'l Nutronics, Inc.)*, 28 F.3d 965 (9th Cir. 1994) and *Stan Lee Media, Inc. v. Conan Sales Co., LLC*, 2:11-cv-06861-SVW, Doc. No. 91 (C.D. Cal. Feb. 8, 2012) (unpublished disposition), *aff'd*, 546 Fed. Appx. 725 (9th Cir. 2013), Defendants contend that the Complaint does not allege facts sufficient to state a claim for fraud on the court. As explained below, those cases do not apply.

In *Nutronics*, the Chapter 7 Trustee rejected two competing offers to purchase the debtor's assets submitted by Isomedix and Radiation Sterilizers, Inc. ("RSI"). *Nutronics,* 28 F.3d at 967. The Trustee instructed Isomedix and RSI to submit new bids. *Id.* Upon learning that they were the only two bidders, Isomedix and RSI formed a joint venture and submitted a much lower combined bid, which the Trustee ultimately accepted. *Id.* The Trustee sought and obtained approval of the combined Isomedix/RSI bid from the Bankruptcy Court. *Id.* In so doing, the Trustee expressed no objection to the Isomedix/RSI joint bid. *Id.*

Twenty-two months after obtaining court approval of the sale to Isomedix/RSI, the Trustee filed an adversary proceeding against Isomedix and RSI seeking to invalidate the sale. *Id.* The Trustee alleged that the combined bid constituted an unlawful business combination in violation of the Sherman Anti-Trust Act. *Id.* The Trustee sought to avoid the sale under §363(n), which provides that sales may be avoided "if the sale price was controlled by an agreement among potential bidders at such sale." *Id.*

The *Nutronics* court affirmed the dismissal of the Trustee's complaint. *Id.* at 971. The court explained that the Trustee's claim under §363(n) was more appropriately characterized as a motion for relief from a final order under Rule 60(b)(3). *Id.* at 969. As such, the claim was barred by Rule 60(b)'s one-year statute of limitations. *Id.*

The court found that the claims were also barred by res judicata. *Id.* at 970. In making this finding, the court emphasized that the Trustee was fully aware of the collusive behavior at the time he sought court approval of the sale order:

> Here the Trustee bases his present antitrust claim on collusive behavior of Isomedix and RSI that was known to him at the time he sought confirmation of the sale, and, indeed, the "collusion" was apparent on the face of the bid. If the joint bid was unduly low because of unlawful collusion, and that fact was known to the trustee at the time, then it should have been brought to the attention of the bankruptcy court. There is little purpose in the court's confirming a sale if it has

---

[12] The Sale Motion is attached to the Complaint and is therefore properly considered by the Court in the context of a motion to dismiss.

> no power or duty to determine whether the terms of sale are in the best interests of the estate. Thus this proceeding confirming the sale was a perfunctory and narrow one only because the Trustee chose not to make it otherwise.

*Id*.

The facts of *Nutronics* bear little relation to the facts of the present case. The Trustee's complaint in *Nutronics* did not even assert a claim for fraud on the court. The *Nutronics* court based its decision upon Rule 60(b) (not Rule 60(d)(3)), and upon the fact that the Trustee was precluded from asserting the collusion claim as a result of his failure to do so previously. In determining that the Trustee's complaint could be characterized only as a motion under Rule 60(b), the *Nutronics* court implicitly concluded that whatever fraud may have occurred was not serious enough to constitute fraud on the court.

The Court notes that the fraud alleged in *Nutronics* was far less serious than the fraud alleged here. It is unclear whether the bankruptcy court that approved the sale to the Isomedix/RSI joint venture was aware of the fact that Isomedix and RSI had submitted separate higher competing bids before submitting a lower combined bid. The court, however, was aware of the essential facts of the sale, including the identity of the purchasers, the fact that the purchasers had submitted a joint bid, and the sales price.

In the present case, the court was not aware of an essential fact of the sale—namely, that the purchaser entities, purportedly acquiring the Properties at arms-length, were in fact under the secret control of the debtors-in-possession, the Roussos Brothers. Even more damaging, the court's lack of awareness was a direct result of the false declarations submitted by the Roussos Brothers.

Contrary to Defendants' contention, *Nutronics* does not stand for the proposition that a bankruptcy sale may be attacked only under Rule 60(b), and never under Rule 60(d)(3). Such a reading would eviscerate the Court's broad equitable powers to cleanse itself of fraud and would render Rule 60(d) meaningless, at least with respect to bankruptcy sales.

*Stan Lee Media* is likewise inapposite. In *Stan Lee*, Chapter 11 debtor-in-possession Stan Lee Media, Inc. ("SLMI") obtained bankruptcy court approval of a settlement with creditor Conan Sales Company, LLC ("CSC"). *Stan Lee*, 2:11-cv-06861-SVW, Doc. No. 91, at *3. SLMI sought the agreement so that its intellectual property assets would not be foreclosed upon by CSC. *Id.* Under the agreement, SLMI assigned its IP assets to CSC in exchange for a $275,000 payment. *Id.*

Ten years later, SLMI, facing seller's remorse, moved to invalidate the court-approved settlement agreement, asserting fraud on the court. *Id.* at *9. As the basis for its fraud on the court claim, SLMI alleged that (1) its shareholders had not received notice of the proposed settlement; (2) one of its attorneys, Arthur Lieberman, held a financial interest in adverse party CSC; (3) the settlement motion had not disclosed the true value of the assets; (4) the stipulation approving the settlement was not signed by a legally authorized representative; and (5) the settlement was not approved by the board. *Id.*

The *Stan Lee* court rejected SLMI's arguments. The court explained that SLMI's shareholders were not entitled to notice of the settlement agreement. *Id.* at *7. It acknowledged that attorney Lieberman may have been conflicted, but pointed out that the agreement was negotiated by another attorney, Klausner, with the full support of the creditor's committee. *Id.* at *7–8. The court further noted that there was no evidence that Klausner had acted other than in the best interests of the creditor's committee. *Id.* at *10. The evidence showed that Klausner had negotiated an arms-length agreement on the committee's behalf. *Id.*

The facts of *Stan Lee* are nothing like those of the present case. In contrast to *Stan Lee*, the sale in the present case was not at arms-length and the debtors-in-possession concealed that fact from the Bankruptcy Court. The debtors-in-possession were not acting in the best interests of the estate, as opposed to Klausner, whom the *Stan Lee* court found acted in the best interests of the creditor's committee.

The Court rejects Theodosios' contention that the Rule 60(d)(3) claim for relief is barred for not being brought within a reasonable period of time. "There is no statute of limitations for fraud on the court." *Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 640 n.10 (N.D. Cal. 1978) *aff'd,* 645 F.2d 699 (9th Cir. 1981). Even if a statute of limitations did apply, the Complaint alleges that Michaelides did not discover the fraud until 2015. Complaint at ¶56.[13] The UST did not discover the fraud until June 18, 2015, shortly before filing the motion to reopen. The Chapter 7 Trustee, the real party in interest, was appointed shortly after the Court granted the motion to reopen, and discovered the fraud upon being appointed. Therefore, the Complaint was brought within a reasonable time.

The Court rejects Theodosios' argument that the fraud on the court claim was irrevocably abandoned by the previous Chapter 7 Trustee when the cases were closed in 2002. Section 554(c) provides that "any property scheduled under section 521(a)(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title." Harry and Theodosios did not schedule the claim for fraud on the court, so section §554(c) does not apply. The fraud on the court claim remains property of the estate pursuant to §554(d), which provides that "property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate."

At oral argument, Harry asserted that under Rule 60(d)(3), the Court could not set aside the Sale Order because Rule 60(d)(3) refers only to setting aside judgments, not orders. Harry pointed to Rule 60(b)'s provision for relief from a "final judgment, order, or proceeding," and suggested that the omission of "order" in Rule 60(d)(3) was an intentional limitation upon the Court's power.

Harry's argument misapprehends the Court's broad-ranging equitable powers to cleanse itself of fraud under Rule 60(d)(3). Courts have spoken with clarity and firmness on this issue: "The power to unearth [fraud upon the court] is the power to unearth it effectively. Accordingly, a federal court may bring before it by appropriate means all those who may be affected by the outcome of its investigation…. No doubt, if the court finds after a proper hearing that fraud has been practiced upon it, or that the very temple of justice has been defiled, the entire cost of the proceedings could justly be assessed against the guilty parties." *Universal Oil Products Co. v. Root Ref. Co.*, 328 U.S. 575, 580 (1946).

Adopting Harry's argument would render bankruptcy courts impotent against the machinations of fraudsters. Much of the business of a Bankruptcy Court is conducted through orders rather than judgments. For example, a chapter 11 plan, which can permanently alter the rights of creditors and in many cases substantially reduce the value of their claims, is confirmed through an order, not a judgment.

---

[13] The Complaint alleges that Michaelides discovered the arbitration action—which provides evidence of Harry and Theodosios' control of S.M.B. and O.F.—"in the beginning of 2015." Complaint at ¶56. Defendants' contention that the fraud was discovered in 2005 misreads the Complaint. First, the Chapter 7 Trustee was not even appointed until 2015 and therefore could not have discovered the fraud in 2005. Second, the Complaint alleges that Michaelides conducted a judgment debtor examination of Theodosios in 2005, and that Theodosios falsely stated that he had no interest in O.F. and S.M.B. Therefore, even if Michaelides' knowledge in 2005 could imputed to the Trustee (which it cannot be), Michaelides had no knowledge of the fraud in 2005.

**B. The Fifth Claim for Relief (Fraud) and Sixth Claim for Relief (Breach of Fiduciary Duty) are Dismissed with Leave to Amend**

The fifth and sixth claims for relief seek compensatory and punitive damages against Harry and Theodosios, based upon Harry and Theodosios' procurement of the August 5, 1994 Sale Order, and subsequent transfer of the Properties to O.F. and S.M.B. on October 19 and November 29, 1994. Harry and Theodosios' cases were converted to chapter 7 on May 2, 1995. Both Harry and Theodosios received discharges on January 12, 1996.

Harry and Theodosios' personal liability for any wrongful actions associated with procuring the Sale Order was terminated by the January 12, 1996 discharge. The period under which the discharge could be revoked under § 727(e)(1) expired on January 12, 1997. The period under which the discharge could be revoked under § 727(e)(2) expired on June 27, 2002, the date the cases were closed. Section 727(e) is a statute of repose and, as such, its deadlines are not subject to equitable tolling. *See Elliott v. Weil (In re Elliot)*, 529 B.R. 747, 754 (B.A.P. 9th Cir. 2015) ("We agree with the First Circuit BAP that, based upon the logic of the Supreme Court's decision in *Kontrick*, § 727(e) is both Congress's grant to, and limitation on, a bankruptcy court's subject matter jurisdiction over discharge revocation actions. Section 727(e) is a non-waivable statute of repose, and its time limits are not subject to tolling such that the failure to commence a § 727(d) adversary proceeding within the time period specified in § 727(e) deprives the bankruptcy court of jurisdiction to adjudicate that action.").

Plaintiff attempts to avoid the effect of the discharge injunction by arguing that the Court should modify the date of the order for relief under § 348(b). Section 348(b) provides that "[u]nless the court for cause orders otherwise," the date of the order for relief in a converted case is the date upon which the case was converted. As applied to the present case, §348(b) means that the date of the order for relief in Harry and Theodosios' chapter 7 bankruptcies was May 2, 1995 (the date the chapter 11 cases were converted to chapter 7). Consequently, unless the date of the order for relief is modified "for cause," the chapter 7 discharge expunges Harry and Theodosios' liability for the conduct associated with procuring the Sale Order, since that conduct occurred preconversion. *See, e.g., In re Toms*, 229 B.R. 646, 653 (Bankr. E.D. Pa. 1999) ("Thus, when a bankruptcy case is converted to chapter 7 from chapters 11, 12 or 13, section 727(b) renders dischargeable all debts which arose before the date of conversion").

At least one court has modified the date of the order for relief to prevent the debtors from receiving a discharge of debts accrued post-filing but pre-conversion. The court in *In re Morris*, 155 B.R. 422, 431 (Bankr. W.D. Tex. 1993) reasoned that modifying the date was appropriate because the debtors converted solely to discharge $100,000 in post-petition gambling debts.[14] However, Plaintiff cites no authority—and the Court has found none—in which cause existed to modify the date of the order for relief nineteen years after the debtors' discharge and thirteen years after the closing of the cases. Such retroactive modification of the date would be inconsistent with the finality of the discharge, exemplified by § 727's strict limitations on discharge revocation.

---

[14] Other courts addressing the issue failed to find sufficient cause to modify the date. *See, e.g., In re Toms*, 229 B.R. 646, 657 (Bankr. E.D. Pa. 1999) (although debtor's conversion would discharge law firm's fees, the conversion from chapter 13 to chapter 7 was not in bad faith because the chapter 13 case had no reasonable likelihood of success); *Rosenberg v. Corio (In re Corio)*, No. ADV. 07-1899, 2008 WL 4372781 (D.N.J. Sept. 22, 2008) (debtor's conversion from chapter 13 to chapter 7 shortly after creditors had obtained stay-relief to pursue entry of a state court judgment was not in bad faith).

The consequences of retroactive modification of the date of the order for relief are greater than those of invalidating the Sale Order. Modifying the date would re-establish the enforceability of debts that have long been discharged. Such modification would affect numerous parties, most of whom are not before the Court.

The Court finds that, as a matter of law, § 348(b) may not be invoked to modify the date of the order for relief nineteen years after discharge and thirteen years after case closing. As a result, the discharge injunction bars Plaintiff from seeking to recover against Harry and Theodosios' personal, non-estate property with respect to the fraud and breach of fiduciary duty claims.

However, the discharge injunction does not prevent Plaintiff from naming Harry and Theodosios as nominal parties provided it is clear that Plaintiff will not seek to collect against their personal assets. *See Rader v. Carson (In re Rader)*, 488 B.R. 406, 415 (B.A.P. 9th Cir. 2013) ("In *Munoz,* the court was faced with determining whether the discharge injunction would be violated if a party sought to establish liability against a debtor solely for the purpose of pursuing payment from a third party. The court in *Munoz* decided it would not, and stated that '[w]here the purpose of the action is to collect from a collateral source, such as insurance or the UEF [Uninsured Employers Fund], and the plaintiff makes it clear that it is not naming the debtor as a party for anything other than formal reasons, no bankruptcy court order is necessary.'").

The Court also finds that Plaintiff has failed to sufficiently plead that the claims for fraud and breach of fiduciary duty are not barred by the statute of limitations. Under California law, an action based on fraud accrues on the date the Plaintiff discovers the facts constituting the fraud. California Code of Civil Procedure §§ 337 and 338(d). The "discovery rule" "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 920 (2005). "In order to rely on the discovery rule for delayed accrual of a cause of action, '[a] plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence.'" *Id.* at 920–21 (internal citations omitted).

The Complaint contains extensive allegations regarding Michaelides' attempts to uncover the fraud and breach of fiduciary duty, but does not contain sufficient allegations showing that Plaintiff, the Trustee, exercised the required diligence. Michaelides' actions cannot be imputed to the Trustee.

Finally, the Court rejects Defendants' argument that the Trustee lacks standing to pursue the fraud and breach of fiduciary claims. Defendants invoke the Wagoner Rule, a Second Circuit doctrine holding that the Trustee lacks standing to assert claims predicated upon injury to creditors. In *CarrAmerica Realty Corp. v. Nvidia Corp.*, 302 F. App'x 514, 517 (9th Cir. 2008), *as amended* (Jan. 22, 2009), *as amended* (Mar. 10, 2009), the Ninth Circuit declined to follow *Wagoner:*

> The Creditors argue that Trustee standing is barred under *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 120 (2d Cir.1991) ('A claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation.'). However, the *Wagoner* rule has been much criticized and we decline to follow it. *See In re Senior Cottages of Am., LLC,* 482 F.3d 997, 1003–04 (8th Cir.2007) (listing authorities rejecting *Wagoner* and concluding that the *in pari delicto* defense has nothing to do with trustee standing).

### C. The Seventh Claim for Relief (Aiding and Abetting Breach of Fiduciary Duty) is Dismissed with Leave to Amend

The Court finds that the Complaint fails to sufficiently show that the claim for aiding and abetting breach of fiduciary duty is not barred by the statute of limitations. Therefore, the seventh claim for relief is dismissed with leave to amend.

As opposed to the fraud on the court claim—as to which there is no statute of limitations—a claim for aiding and abetting breach of fiduciary duty is subject to a statute of limitations of either three or four years, depending on the specific circumstances of the breach. *See generally Schneider v. Union Oil Co.*, 6 Cal. App. 3d 987, 993, 86 Cal. Rptr. 315 (Ct. App. 1970) (discussing different statutes of limitation that may apply to a claim for breach of fiduciary duty).

Although it may be inferred from the context in which the Complaint was filed that the Trustee became aware of the fiduciary breach sometime after he was appointed in 2015, the Complaint does not specifically allege the precise date of awareness. The Complaint also fails to sufficiently allege that the Trustee exercised due diligence in attempting to discover the facts, as is necessary to equitably toll the statute of limitations.[15] *Fed. Election Comm'n v. Williams*, 104 F.3d 237, 240-41 (9th Cir. 1996).

The Court also notes that, by virtue of § 524(a)(3), the Trustee's recovery against non-debtor spouses Paula and Christine must be limited to those spouses' "separate property and any pre-bankruptcy community property not included in the estate." *Sanwa Bank California v. Chang*, 87 Cal. App. 4th 1314, 1318-19, 105 Cal. Rptr. 2d 330, 333 (2001). As explained by the *Sanwa Bank* court, although § 524(a)(3) is "not a discharge of personal liability for the non-filing spouse," it does prevent "recovery, by a creditor holding a community claim, of after-acquired community property." *Id.*

### D. The Fourth Claim for Relief (Turnover Under §542) States a Claim Upon Which Relief May Be Granted

Section 542 provides: "[A]n entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell or lease under section 363 of this title, … shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." The "property" referred to in § 542 "is generally understood to mean 'property of the estate,' as defined in section 541." 5 *Collier on Bankruptcy* ¶542.02[2] (16th ed. rev. 2015).

Assuming that the allegations set forth in the Complaint are true, as the Court must in the context of a motion to dismiss, the Properties remain property of the estate. The Sale Order, having been procured by fraud on the court, is void *ab initio*. *See America's Servicing Co. v. Schwartz-Tallard*, 438 B.R. 313, 320 (D. Nev. 2010) (holding that an order obtained through fraud on the court is void *ab initio*). As a result, the estate was never divested of its interest in the Properties. The cases cited by Defendants holding that turnover could not be invoked subsequent to a § 363 sale do not apply as those cases did not involve a void Sale Order procured through fraud on the court.

---

[15] As stated previously, the Complaint contains extensive allegations as to Michaelides' attempts to uncover the fraud and breach of fiduciary duty. Michaelides' actions cannot be imputed to the Trustee.

13

### E. The Quiet Title Action is Not Time-Barred

"Since there is no statute of limitations governing quiet title actions as such, it is ordinarily necessary to refer to the underlying theory of relief to determine which statute applies." *Muktarian v. Barmby*, 63 Cal.2d 558 (1965). Plaintiff's quiet title action is predicated upon the action to vacate the sale for fraud on the court. As explained above, there is no statute of limitations for actions asserting fraud on the court. Even if the Court were to impose a timeliness requirement on the fraud on the court claim, the Court finds Plaintiff discovered the fraud in 2015 and that accordingly, the claim is timely. Consequently, Plaintiff's quiet title action is not time-barred.

Defendants' reliance upon *McCaslin v. Hamblem*, 37 Cal.2d 196 (1951) is misplaced. In *McCaslin*, the defendant acquired title to property through a tax deficiency sale. 37 Cal.2d at 197. The original owners sought to quiet title against the defendant. *Id.* at 197–98. The *McCaslin* court found that under § 175 of the Revenue and Taxation code, title to property acquired in a tax deficiency sale was entitled to a conclusive presumption of validity unless the deed was challenged within one year. *Id.* at 198. The facts of *McCaslin* do not apply to the case at hand.

### F. Michaelides' Previous State Court Litigation Does Not Support Dismissal of the Complaint

Defendants devote substantial space to describing previous state court litigation between Michaelides and themselves. The Court takes judicial notice of the documents submitted in connection with the state court litigation but finds those documents to be of minimal relevance in determining the instant motions to dismiss. Quite simply, Michaelides is not the real party in interest in this action; the Chapter 7 Trustee is.

Defendants' argument that the Complaint must be dismissed on the grounds of judicial estoppel and waiver suffer from the defect of imputing Michaelides' actions to the Chapter 7 Trustee. The extent to which Michaelides may or may have waived her claims, or the extent to which Michaelides may or may not be judicially estopped, has no bearing upon the Chapter 7 Trustee's ability to bring this action. The Trustee is independent of Michaelides and is not bound by her actions.

Defendants' contention that the Trustee "is being used as a tool to do [Michaelides'] bidding," Theodosios MTD at 22 n.5, is not well taken. The Trustee retained special litigation counsel only after he conducted an independent evaluation of the action and concluded that it had merit. *See generally* Verification of Complaint, signed by Chapter 7 Trustee Howard M. Ehrenberg [Doc. No. 1]. Unsubstantiated and incendiary allegations that the Trustee is acting in bad faith serve no purpose and are of no assistance to the Court in adjudicating the issues posed by the Complaint.

Date: November 25, 2015

Ernest M. Robles
United States Bankruptcy Judge